# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

EDDIE TARDY, individually, and
as Administrator of the Estate of
LAEDDIE COLEMAN,

    *Plaintiffs*,

v.

CORECIVIC OF TENNESSEE, LLC,
*et al.*,

    *Defendants*.

Case No. 3:22-cv-00681

JURY DEMANDED

## PLAINTIFF'S RESPONSE IN OPPOSITION TO CORECIVIC DEFENDANTS' MOTION FOR ENTRY OF PROTECTIVE ORDER [DOC. 40]

### I.  INTRODUCTION

Comes now the Plaintiff, through counsel, and respectfully responds in opposition to the CoreCivic Defendants' *Motion for Entry of Protective Order* (Doc. 40). For the reasons detailed below, the motion should be **DENIED**.

### II.  FACTS

On September 7, 2021, LaEddie Coleman was murdered while incarcerated at Hardeman County Correctional Facility (HCCF), a for-profit prison operated by CoreCivic. *See* Doc. 38 at 2, ¶ 1. According to CoreCivic's incident report, three inmates:

> [I]mmediately started assaulting Inmate Coleman in GB Dayroom with three unknown sharp objects. Inmate Gallegly, Inmate Williams, and Inmate Tackett took turns stabbing Inmate Coleman multiple times. Inmate Williams is seen via Milestone stabbing Inmate Coleman in the neck and blood squirting everywhere as Coleman started to run and fall to the pod door while he waits for help. Inmate Coleman was taking [sic] to medical where EMS arrived and Paramedic Harvey advised staff to stop CPR due no [sic] signs of life from Inmate Coleman.

*See* Doc. 45–1 at 6–7.

The foregoing notwithstanding, CoreCivic—a government contractor exercising a quintessential government function for profit—inexplicably denies that it failed to protect Mr. Coleman from violence at the hands of other prisoners. *Compare* Doc. 1 at 10, ¶ 61 ("The individual Defendants failed to protect Mr. Coleman from violence at the hands of other prisoners."), *with* Doc. 38 at 8, ¶ 61 ("Denied."). Mr. Coleman's murder also supplements "*at least* five [other] homicides" at the same facility since 2016 alone, *compare* Doc. 1 at 6, ¶ 28 ("Since 2016, there have been *at least* five homicides—not including Mr. Coleman's murder—at Hardeman County Correctional Facility"), *with* Doc. 38 at 5, ¶ 28 ("Admitted, but . . . .").

With this important context in mind, CoreCivic seeks a vast protective order that would enable it to delay and severely restrict public scrutiny of its chronically deficient facility—a facility that generated literally hundreds of pages of contract non-compliance reports and liquidated damages penalties from January–October 2021 alone. *See* Doc. 44–4. The triggering event for CoreCivic's presumptively improper request is a subpoena directed to a non-party regarding which CoreCivic: (1) lacks standing to object; (2) did not timely object; (3) ultimately objected to with conclusory statements but without evidence; and (4) which is at least partially moot. *See generally* Doc. 45. Further, no evidence is appended to the CoreCivic Defendants' motion for a protective order in support of it. *See* Doc. 41. The CoreCivic Defendants' unwillingness (or, perhaps, inability) to muster sworn evidence, based on personal knowledge, in support of their claimed need for protection was also a central basis for the Plaintiff's opposition to it. *See* **Ex. 1** at 1 ("if you are going to make factual claims like this and assert that they support a protective order, I will invite you to attest to their truth under oath, based on a claim of

- 2 -

Case 3:22-cv-00681   Document 46   Filed 12/16/22   Page 2 of 18 PageID #: 1433

personal knowledge, and subject to penalty of perjury. Once such a declaration is produced, I am happy to reconsider our position here.").

### III.  LEGAL STANDARD

The "entry of a protective order is contrary to the basic policy in favor of broad discovery," and "the party that seeks a protective order has a heavy burden to show substantial justification for withholding information from the public." *See Anderson v. City of Fulton, Kentucky*, No. 518CV00032TBRLLK, 2019 WL 729986, at *1 (W.D. Ky. Feb. 20, 2019) (citing *Williams v. Baptist Healthcare Sys., Inc.*, No. 3:16-CV-00236-CRS, 2018 WL 989546, at *2 (W.D. Ky. Feb. 20, 2018); *Proctor & Gamble Co. v. Banker's Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996) ("While District Courts have the discretion to issue protective orders, that discretion is limited by the careful dictates of Fed. R. Civ. P. 26 and is circumscribed by a long-established tradition which values public access to court proceedings."); *Meyer Goldberg, Inc. of Lorain v. Fisher Foods, Inc.*, 823 F.2d 159, 162 (6th Cir. 1987) ("'As a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying public access to the proceedings.'")). Nonetheless:

> Under Federal Rule of Civil Procedure 26(c)(1)(G), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including … requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way…." **Good cause exists when the party moving for the protective order "articulate[s] specific facts showing 'clearly defined and serious injury' resulting from the discovery sought…."** *Nix v. Sword*, 11 Fed. App'x 498, 500 (6th Cir. 2001) (citing *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987)). "The burden of establishing good cause for a protective order rests with the movant." *Nix v. Sword*, 11 Fed. App'x 498, 500 (6th Cir. May 24, 2011); *see also In re Skelaxin Antitrust Litig.*, 292 F.R.D. 544, 549 (E.D. Tenn. 2013) ("To show good cause, the moving party must articulate specific facts that show a clearly defined and serious injury resulting from the discovery sought; mere

conclusory statements will not be sufficient.").

*Id.* (emphasis added).

Put another way: good cause is not something that can merely be recited with conclusory statements; instead, specificity showing a clearly defined and serious injury that will result from the absence of a protective order is required. *See id. See also Nix*, 11 F. App'x at 500 ("'To show good cause, a movant for a protective order must articulate specific facts showing 'clearly defined and serious injury' resulting from the discovery sought and cannot rely on mere conclusory statements.'") (quoting *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C.1987).

## IV. ARGUMENT

### A. The CoreCivic Defendants have failed to demonstrate good cause for a protective order.

The CoreCivic Defendants' motion for a protective order is not supported by evidence in any respect. *See generally* Doc. 41. *See also Ashdown v. Buchanan*, No. 2:17-CV-495, 2021 WL 2643111, at *5 (S.D. Ohio June 28, 2021) ("The statements of counsel in their memoranda are not evidence.") (citing *Tapco Products Co. v. Van Mark Products Corp.*, 446 F.2d 420, 429 (6th Cir. 1971) (unsworn self-serving statements of counsel are not evidence); *Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp.2d 850, 853, n. 3 (S.D. Ohio 2000) (statements of counsel in memorandum are not evidence); *Bond v. Antero Resources Corp.*, 328 F.R.D. 187, 194 (S.D. Ohio 2018) (conclusory assertions of counsel are not evidence)). *See also Plumbers Loc. 98 Defined Ben. Funds v. Controlled Water, Inc.*, No. 03-CV-72888-DT, 2006 WL 2708544, at *2, n.3 (E.D. Mich. Sept. 19, 2006) ("It is universally settled that 'statements of counsel are not evidence' and do not create issues of fact.") (collecting cases). Accordingly, when adjudicating the CoreCivic Defendants'

- 4 -

motion, this Court is asked to rely strictly on unsworn statements from CoreCivic's counsel. *See* Doc. 41. Specifically, it is asked to rely on unsworn statements from counsel who have already represented to this Court that the CoreCivic Defendants protected Mr. Coleman—who was viciously and fatally stabbed, repeatedly, by at least three other inmates while CoreCivic's guards were not around and before they arrived, *see* Doc. 45–1 at 6–7—from violence at the hands of other prisoners. *Compare* Doc. 1 at 10, ¶ 61 ("The individual Defendants failed to protect Mr. Coleman from violence at the hands of other prisoners."), *with* Doc. 38 at 8, ¶ 61 ("Denied."). Those attorneys also contend that Mr. Coleman is "at fault" for his own murder. *Compare* Doc. 38 at 12, *with* Doc. 45–1 at 6 ("Once Inmate Gallegly, Inmate Williams, and Inmate Tackett returned to GB, they immediately started assaulting Inmate Coleman in GB Dayroom with three unknown sharp objects. Inmate Gallegly, Inmate Williams, and Inmate Tackett took turns stabbing Inmate Coleman multiple times. Inmate Williams is seen via Milestone stabbing Inmate Coleman in the neck and blood squirting everywhere as Coleman started to run and fall to the pod door while he waits for help.").

Turning to the asserted substance of the movants' claims: The CoreCivic Defendants initially assert that they have demonstrated good cause for a protective order merely because what they characterize as "[t]he incident at issue"—more accurately described as LaEddie Coleman's brutal murder—took place inside a prison. *See* Doc. 41 at 3 ("The incident at issue in this case occurred inside HCCF. (ECF No. 1). Courts have routinely found 'good cause' to limit discovery or disclosure of information implicating the safety and security of prisons and jails."). The Defendants make no attempt to bridge the gap from an occurrence inside a prison to "implicating the safety and security" of HCCF with evidence, though. *See id.* Thus, in the absence of such "'specific facts that

- 5 -

Case 3:22-cv-00681   Document 46   Filed 12/16/22   Page 5 of 18 PageID #: 1436

show a clearly defined and serious injury resulting from the discovery sought,'" the CoreCivic Defendants' motion for a protective order must be denied. *See Nix*, 11 F. App'x at 500 (quoting *Avirgan*, 118 F.R.D. at 254).

Somewhat more specifically, the CoreCivic Defendants claim that "the documents requested in the TDOC subpoena by itself [sic] will likely implicate the safety and security of HCCF and necessitate the entry of a protective order." *See* Doc. 41 at 3–4. The Plaintiff already has several of the documents that are responsive to the Plaintiff's subpoena, though. *See, e.g.,* Doc. 44–4 (contract non-compliance reports and liquidated damages reports), Doc. 45–1 (incident reports). Review of those documents also makes plain that <u>they affect no safety or security concerns whatsoever</u>. That reality should heighten this court's skepticism regarding both the reliability of counsel's representations and what the Defendants are really concerned about as far as their motion is concerned.[1] *Cf. Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 487, n.2 (M.D. Tenn. 2019) ("CoreCivic has argued that its internal responses to BOP scrutiny should be kept under seal because their disclosure could harm CoreCivic in the marketplace. (Docket No. 155 at 6.) The court, however, discerns no serious threat of unfair competition associated with disclosure of

---

[1] CoreCivic's motion can fairly be read as a motion that seeks protection from bad *publicity*, rather than a motion that is actually concerned about safety. Otherwise, the fact that Plaintiff's counsel is a vocal critic of the company would not matter to the movants. *See* Doc. 41 at 6. Simply put: If release of a document actually posed a genuine security risk to HCCF, then CoreCivic would not want the document in *anyone's* hands without protection. CoreCivic, however, devotes a substantial portion of its briefing regarding the supposed "necessity of such a protective order" to the "urgent" need to prevent a vocal critic, specifically, from disseminating the information he receives. *See id.* This concern speaks volumes. It is also consistent with CoreCivic's pattern of bad faith claims regarding the need for protection under similar circumstances that plainly do not warrant it. *See Grae*, 330 F.R.D. at 487, n.2 ("CoreCivic has argued that its internal responses to BOP scrutiny should be kept under seal because their disclosure could harm CoreCivic in the marketplace. (Docket No. 155 at 6.) The court, however, discerns no serious threat of unfair competition associated with disclosure of the relevant communications. None of the cited internal conversations reveal any confidential CoreCivic strategies, practices, or research and development. The conversations cited may be awkward or embarrassing for CoreCivic to see disclosed, but that, alone, is not enough to justify an unyielding seal in this case.").

the relevant communications. None of the cited internal conversations reveal any confidential CoreCivic strategies, practices, or research and development. The conversations cited may be awkward or embarrassing for CoreCivic to see disclosed, but that, alone, is not enough to justify an unyielding seal in this case.").

Having made only conclusory—and, at least in part, demonstrably baseless—claims regarding the safety and security concerns implicated by the documents that are responsive to the Plaintiff's subpoena, then, CoreCivic turns to the subpoenaed video footage. Specifically, the CoreCivic Defendants assert—also in conclusory fashion—that "[s]uch footage implicates the safety and security of HCCF and should be subject to a protective order." *See* Doc. 41 at 4. In support of that statement, though, the CoreCivic Defendants cite other cases in which protective orders have been granted, rather than furnishing evidence supporting their claim for protection of the specific video footage at issue *here. See id.* As noted above, the CoreCivic Defendants are also apparently unwilling or unable to have anyone with personal knowledge attest, under oath, that security concerns would arise from disclosure of the specific video at issue in this litigation. *See* **Ex. 1** at 1–2.

Regarding the video here, CoreCivic also limits its response to claims about what the video "could" show—as opposed to what it *does* show—stating:

> Surveillance footage of the inside of HCCF **could** show blind spots, hidden security cameras, and specific camera angles, all of which could undermine the safety and security of the facility. Should inmates learn the location of blind spots or other information that could be gleaned from the footage, they could more readily transport contraband without detection and/or commit crimes off-screen.

*See* Doc. 41 at 4 (emphasis added).

Is there *actually* any hidden security footage that is responsive to the Plaintiff's

subpoena, though? Is the angle captured from the responsive September 7, 2021 video footage even the same angle captured today? Who knows. Certainly, at this juncture, the Defendants have failed to furnish any evidence of such concerns, given their failure—indeed, refusal—to support their motion with any evidence at all. In any event, concerns that are limited to what responsive video footage "could" show are woefully inadequate to constitute "'specific facts showing 'clearly defined and serious injury' resulting from the discovery sought and cannot rely on mere conclusory statements.'" *Nix*, 11 F. App'x at 500 (quoting *Avirgan*, 118 F.R.D. at 254.

By contrast, there is evidence of what the video actually *does* show. In particular, it shows a brutal homicide taking place while LaEddie Coleman—an inmate in CoreCivic's care—waits for help from guards who are not around and do not arrive until after it is too late. Specifically, it shows that three inmates:

> [S]tarted assaulting Inmate Coleman in GB Dayroom with three unknown sharp objects. Inmate Gallegly, Inmate Williams, and Inmate Tackett took turns stabbing Inmate Coleman multiple times. Inmate Williams is seen via Milestone stabbing Inmate Coleman in the neck and blood squirting everywhere as Coleman started to run and fall to the pod door while he waits for help. Inmate Coleman was taking [sic] to medical where EMS arrived and Paramedic Harvey advised staff to stop CPR due no [sic] signs of life from Inmate Coleman.

*See* Doc. 45–1.

As CoreCivic is well aware, Mr. Coleman's murder also occurred while HCCF was in a state of massive contract and understaffing non-compliance that triggered extensive liquidated damages penalties. *See* Doc. 44–4 at 383–84, *id*. at 470–71. Under these heinous circumstances, it is perhaps understandable that CoreCivic would like to restrict public knowledge of and access to the above evidence of its fatal misconduct. Doubly so given that state legislators are openly discussing the prospect of another federal takeover

of Tennessee's prison system in light the TDOC's consistent failure to regulate CoreCivic competently and bring it to heel despite years of massive understaffing and contract non-compliance. *See* Sam Stockard, *Lawmaker raises specter of federal takeover of Tennessee prison system*, TENNESSEE LOOKOUT (Sep. 27, 2022), https://tennesseelookout.com/2022/09/27/lawmaker-raises-specter-of-federal-takeover-of-tennessee-prison-system/ ("Lawmakers blasted the Department of Correction Monday for making a weak response to a 2020 audit, with one legislator questioning whether the federal courts need to take over Tennessee's prison system again. . . .Under questioning from outgoing Democratic Rep. Mike Stewart, they finally admitted that CoreCivic, the state's private prison operator, paid more than $10.6 million in liquidated damages over the last two years compared to $7.3 million from 2018 to 2020 for failing to meet staffing requirements.") (**Ex. 2**).

Given this context—specifically, the evidence of what the video footage actually does show, paired with CoreCivic's transparent motivation to conceal that evidence from the public for reasons that are unrelated to security—this Court has no business reflexively deferring to CoreCivic's unsupported assertions regarding safety and security. That is especially true given the company's notorious reputation—including among this Court's sister jurists—of caring so *little* about the safety of its facilities year after year after year. *See, e.g.,* Allison Kite, *For-profit federal prison an understaffed 'hell hole' of violence, death and drugs*, MISSOURI INDEPENDENT (Oct. 7, 2021), https://missouriindependent.com/2021/10/07/for-profit-federal-prison-an-understaffed-hell-hole-of-violence-death-and-drugs/ (**Ex. 3**) ("'The only way I could describe it frankly, what's going on at CoreCivic right now is it's an absolute hell hole,' said U.S. District Judge Julie Robinson during a sentencing hearing in September. 'The

- 9 -

Case 3:22-cv-00681 Document 46 Filed 12/16/22 Page 9 of 18 PageID #: 1440

court is aware of it,' she said. 'The defense bar is aware of it. The prosecutors are aware of it. The United States Marshals are aware of it.'").

Instead, this Court should (at minimum) scrutinize the video itself—which CoreCivic has not yet provided, under seal or otherwise, for this Court's review—to determine whether CoreCivic's professed security concerns are genuine in any respect. As another District Court in this Circuit explained under similar circumstances:

> Under the Local Rules, a motion for a protective order must "state the reason that sealing each item is necessary; state the reason that a means other than sealing is not available or unsatisfactory to preserve the interest advanced by the movant in support of the seal; and have a supporting brief." See E.D. Mich. LR 5.3(b)(2)(iii)-(v). The only reason offered for sealing the CD is the defendant's conclusory allegation that sealing is necessary to "maintain the security of the prison facility." Br. in Supp. of Def.'s Mot. for Protective Order to Seal Documents [dkt # 11] at 3. A review of the still clips in this case, however, reveals no cause for a security concern.
>
> . . . .
>
> Certainly every detail of prison life need not be on display for public consumption. But **when there is a claim that prisoner abuse has occurred, there can be little justification for concealing key evidence that exposes the wrongdoer** or vindicates the accused personnel. When that key evidence forms the basis for a dispositive decision in the case, then only a compelling public interest can justify sealing that evidence. That compelling interest is absent here, but even if it existed, it would not warrant withholding the evidence from a party to the dispute.

*Evans v. Mallory*, No. 08-12725, 2009 WL 2900718, at *3 (E.D. Mich. Sept. 2, 2009) (emphasis added).

By contrast, allowing CoreCivic to win secrecy merely by reciting unsupported concerns about safety and security—particularly when it is unwilling to support those concerns with an attestation under oath, and also when it is being something less than truthful about having protected Mr. Coleman from violence, *compare* Doc. 1 at 10, ¶ 61 ("The individual Defendants failed to protect Mr. Coleman from violence at the hands of

other prisoners."), *with* Doc. 38 at 8, ¶ 61 ("Denied.")—would be clear error.

Last, the movants turn to "the requested shift rosters," which they assert "could implicate the safety and security of HCCF." *See* Doc. 41 at 4–5. CoreCivic has produced staffing rosters spanning much longer time periods in past cases without raising such concerns, though. *See* Doc. 45–2 (Trousdale Staffing Reports from 11/30/2017–1/31/2020). As such, CoreCivic's claim here that "public disclosure would likely affect the safety and security of HCCF" is similarly suspect. *See* Doc. 41 at 5. That is especially true given that the requested staff rosters in this case span just a seven-day period from well over a year ago, rendering their contents stale—and inactionable to any inmate—by any measure. *See* Doc. 44–1 at 1 (seeking "[t]he HCCF staffing rosters for September 1–7, 2021.").

Separate and apart from any other matter, the Plaintiff also observes that the timing of CoreCivic's motion—well after the objection deadline to the Plaintiff's subpoena expired, and several weeks after the CoreCivic Defendants' received notice of the Plaintiff's subpoena, *see* Doc. 44–2, which the parties also discussed at length during the Court's Initial Case Management Conference, *see* Doc. 33 at 4—alone casts doubt on the seriousness of the movants' professed security concerns. Simply put: a credible threat to safety and security at a prison facility would not warrant a lackadaisical, untimely, evidentiarily barren objection just five days before production was due. In assessing the credibility of the CoreCivic Defendants' claims that they will suffer a clearly defined and serious injury if they are unable to conceal responsive documents from the public, this Court may—and should—consider that history as well.

For all of these reasons, the CoreCivic Defendants' unsupported motion for a protective order is substantively baseless. Accordingly, the motion should be denied.

### B. CoreCivic's proposed protective order and the reason why CoreCivic desires it is inadequate.

After failing to support their claimed need for protection with evidence, and after supporting their motion with unsworn factual claims from counsel that are demonstrably suspect, the CoreCivic Defendants propose a protective order that will enable them to delay public access to information of extraordinary public concern, even in bad faith, for months, at least, without consequence. *See* Doc. 40–1 at 6–7, ¶ 10 (providing for a written notice contest requirement, a fourteen-day private response period that comes in addition to a fourteen-day designation period, then a motion period, and providing further that "[u]ntil such time as the Court describes otherwise, the disputed information shall be treated as 'CONFIDENTIAL' or 'CONFIDENTIAL ATTORNEY'S EYES ONLY'" regardless of whether it is or not, with no ultimate consequence for bad-faith designations). They also style this order as one that "would allow Plaintiff the opportunity to challenge a confidential designation and to bring such a challenge to the Court's attention if necessary." *See* Doc. 41 at 7.

Once again, CoreCivic's own asserted justification for such an order betrays the ruse. CoreCivic complains, specifically, about "Plaintiff's counsel's propensity to subpoena CoreCivic materials from third parties" and that fact that:

> [S]eeking CoreCivic materials from third-parties who obtained them in other litigation is nothing new for Plaintiff's counsel. He took the same action in *Newby v. CoreCivic of Tennessee, LLC, et al.*, No. 3:22-cv-00093 (M.D. Tenn. 2022) when he subpoenaed records obtained by another attorney in another case brought against CoreCivic.

*See* Doc. 41 at 7–8.

Because CoreCivic brings them up, the actual underlying events in the *Newby* litigation that the movants reference are worthy of mention. There, the plaintiff—another

- 12 -

Case 3:22-cv-00681   Document 46   Filed 12/16/22   Page 12 of 18 PageID #: 1443

grieving parent of a CoreCivic homicide victim—also subpoenaed relevant materials from third-parties. CoreCivic opposed the subpoena unsuccessfully, among other grounds, on the asserted basis that it sought irrelevant information—a flagrantly false claim that the Court properly recognized as bogus upon review, given that the responsive materials (among other things) discussed the *Newby* Plaintiff's specific homicide and related directly to the staffing issues that were prominently involved in that case. *See* **Ex. 4** at 6–7 ("But, Ms. Newby has demonstrated that some of the documents Ms. Herzfeld already produced in response to the subpoena are indeed relevant, as they mention Mr. Childress by name or pertain to Ms. Newby's allegations about staffing issues at the Trousdale Turner facility."). Upon review of early responsive materials, the undersigned also discovered that CoreCivic had egregiously abused protective order designations in the case in an effort to suppress disclosure of embarrassing materials that were not even conceivably confidential. Specifically, the plaintiff noted:

> The furnished documents revealed something else of note as well: That the Defendants—consistent with their history of similar misconduct—had egregiously abused protective order designations. For instance, Exhibit #1 to the deposition of one of the TDOC's contract monitors is described as "two pages in [a] May 17th notice of breach and assessment of liquidated damages," in addition to "a number of" other liquidated damages assessments for what appear to be contract non-compliance and understaffing violations. *See* Doc. 37-1, at 26:2–9. The exhibit was not produced because it appears to have been marked confidential. Further, because it was notice of a liquidated damages penalty assessed by the TDOC, it also *does not appear to be a document that belongs to CoreCivic*. Instead, it appears to be a non-confidential public record that the Defendants illicitly marked confidential. The same appears to be true of Exhibit #2 to Mr. Brun's deposition, which is described as a TDOC "noncompliance report." *See id*. at 31:24–32:3.
>
> These are nowhere near the only examples, though. For instance, pages 2–3 of the deposition of John Walton describe eleven exhibits to that deposition. *See* Doc. 37–2 at 3–4. Several of them—including Exhibit #5, described as "non-compliant reports starting with Bates 000291," *see id*. at 3—appear to have been marked confidential. Similarly, in Kelly Young's
- 13 -

Case 3:22-cv-00681   Document 46   Filed 12/16/22   Page 13 of 18 PageID #: 1444

> deposition, *see* Doc. 37-7, an exhibit described as a "privately operated facility notification of noncompliance, Tennessee Department of Correction" appears to have been marked confidential, *see id*. at 22:19–22, as was an exhibit described as a "six-month follow-up report to the comptroller's office related to the 2020 comptroller audit." *Id*. at 43:16–19.
>
> The abuse gets worse. In the deposition of Vincent Finamore, for instance, Exhibit #3 to the deposition is described as the "November 2017 comptroller report." *See* Doc. 37-10, at 3. That is almost a quintessentially public record that is made available by the Tennessee Comptroller to anyone with an internet connection and also happens to be Exhibit #5 to the Plaintiff's Complaint in this case. *See* Doc. 1-5. Even so, the Defendants appear to have marked the document confidential. Further, and somehow even worse than that: Exhibit #20 to Mr. Finamore's deposition is described as "a collection of news articles[.]" See Doc. 37-10 at 87:15–17 ("I will submit to you that it is a collection of news articles that were in the production that were produced to us."). See also id. at 4 ("News articles beginning with TDOC 013562"). Even so, the Defendants appear to have marked ***news articles*** confidential.

*See* **Ex. 5** (Newby Response in Opposition to Defendants' Motion to Quash), at 4–6.

Because Ms. Newby had not stipulated to entry of a protective order of the sort CoreCivic seeks here, though, upon her receipt of non-confidential responsive documents, CoreCivic was unable to stymie public access to documents of overwhelming public concern that it wished to conceal for reasons completely unrelated to security or confidentiality—such as documents indicating that CoreCivic had restricted inmates' ability to purchase the Koran and the Torah, but not the Bible, *see* Liam Adams, *Trousdale Turner didn't accommodate Muslim inmates, briefly banned Quran, documents reveal*, THE TENNESSEAN (May 17, 2022), https://www.tennessean.com/story/news/religion/2022/05/18/trousdale-turner-tennessee-prison-muslim-inmates-quran-banned/9735400002/ (**Ex. 6**), and documents demonstrating CoreCivic successful regulatory capture at the highest levels of the Tennessee Department of Correction, including having the TDOC's Commissioner lobby Tennessee's governor for lower liquidated damages penalties arising from

- 14 -

CoreCivic's contract non-compliance in service of CoreCivic's profit margin:

> BOZA PLEASANT-BEY vs STATE OF TENNESSEE
> FINAMORE, VINCENT on 06/17/2021
> Page 61
>
> 1  Q.  Was Commissioner Parker at that meeting?
> 2  A.  Commissioner Parker was at the meeting, yes.
> 3  Q.  Did Commissioner Parker take a position on
> 4  the fines?
> 5  A.  He was -- you know, he was there with Wes
> 6  Landers. And together, they were just explaining to us
> 7  how steep the fines would be based on the rate, and that
> 8  they had a concern that this would be very detrimental
> 9  to CoreCivic. And you know, keeping them as a
> 10  contractor could influence, you know, I guess the
> 11  relationship between them.
> 12  I am not sure I am phrasing that right, but
> 13  I'm just saying that he had a concern that it was a lot
> 14  of money. And in the course of business, that would be
> 15  a concern to any company that would have fines, you
> 16  know, levied against them. And certainly, the
> 17  department being contracted to CoreCivic, you know, it's
> 18  in their interest to keep CoreCivic housing prisons and
> 19  with their contracts. So they just had a concern that
> 20  the rate they agreed to would be a lot -- amount to a
> 21  substantial amount of money.
> 22  Q.  And the fines, your understanding is, would
> 23  be levied if there were violations of the contract?
> 24  A.  Correct. This was part of the contract
> 25  called liquidated damages. And basically, under certain

See **Ex. 7** (Deposition of Vincent Finamore) at 61:1–24.

CoreCivic has since learned its lesson. Accordingly, operating under the

expectation that this Court will reflexively defer to its unsupported confidentiality claims and fail to recognize its actual goal of suppressing information of public importance that is embarrassing to CoreCivic—a government actor in this context—but poses no genuine safety or security concern, CoreCivic has moved this Court for a protective order that will guarantee CoreCivic an opportunity to delay, restrict, and otherwise obstruct public access to information that is not genuinely confidential in any respect. *See* Docs. 40; 40–1; 41. This Court's obligation, however, is to have exactly the opposite concern in mind. *See, e.g., Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1179 (6th Cir. 1983) ("secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption."). *See also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 560 (1976) (placing extra scrutiny on "[d]elays imposed by governmental authority"); *id.* at 609 (Brennan, J., concurring) (noting that "delay inherent in judicial proceedings could itself destroy the contemporary news value of the information the press seeks to disseminate"); *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) ("The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression."). *Cf. Doe v. Pub. Citizen*, 749 F.3d 246, 272 (4th Cir. 2014) ("Because the public benefits attendant with open proceedings are compromised by delayed disclosure of documents, we take this opportunity to underscore the caution of our precedent and emphasize that the public and press generally have a contemporaneous right of access to court documents and proceedings when the right applies. 'Each passing day may constitute a separate and cognizable infringement of the First Amendment.'") (cleaned up).

For all of these reasons, the CoreCivic Defendants' *Motion for Entry of Protective*

*Order* (Doc. 40) is undergirded by an improper secrecy motive that is untethered to any demonstrated concerns about safety or security. Accordingly, the motion should be denied.

## V.  CONCLUSION

For the foregoing reasons, the CoreCivic Defendants' *Motion for Entry of Protective Order* (Doc. 40) should be **DENIED**.

Respectfully submitted,

/s/ Daniel A. Horwitz
Daniel A. Horwitz, BPR #032176
Lindsay Smith, BPR #035937
Melissa Dix, BPR #038535
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
lindsay@horwitz.law
melissa@horwitz.law
(615) 739-2888

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

   I hereby certify on this the 16th day of December, 2022, a copy of the foregoing document was filed electronically upon the individuals identified below. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on electronic filing receipt. All other parties will be served by regular U.S. Mail:

 Nathan D. Tilly
 Pentecost & Glenn
 162 Murray Guard Drive, Suite B
 Jackson, Tennessee 38305
 ntilly@pgmfirm.com

 *Attorney for CoreCivic Defendants*


 Brian F. Walthart
 BRIAN F. WALTHART, 024777
 Post Office Box 198349
 201 4th Avenue N., Suite 1400
 Nashville, TN 37219
 Phone: (615) 499-7177
 Facsimile: (615) 5231496
 Email: brian.walthart@mgclaw.com

 *Attorney for Hardeman County*


By:  /s/ Daniel A. Horwitz